I have four argued cases before the court this morning. The first case, I'm going to have to ask this. It's Leak Surveys versus, is it FLIR or FLIR? How is that pronounced? FLIR, Your Honor. FLIR versus FLIR Systems, Inc. Case number 161299. Mr. Puckett, you want five minutes for rebuttal? I do, Your Honor. Okay, that's fine. You may begin. Good morning, and may it please the court. Donald Puckett for Appellant Leak Surveys, Inc. I know there are many issues to address today and a very large record. I know the panel will have many questions. I think I can summarize Leak Surveys' positions by articulating just four very succinct points, and I'm going to try to do that in about 60 seconds or less, if I may. First, the Board's final written decision, like FLIR's IPR petitions below, fundamentally misapprehended the technical problem that is addressed by the Leak Surveys' patents. The technical problem was not imaging a gas under some conditions. The problem was how to adapt or modify prior art imaging devices to overcome the known deficiencies that made all prior art systems unsuitable for detecting leaks under real-world conditions. That's the technical problem addressed in these patents. Second, the Board relied upon fundamentally flawed claim constructions to essentially rewrite the patent claims. The Board's erroneous constructions eliminate critical elements and realign the patent claims to coincide with the Board's misguided view of the technical problem. The Board's erroneous claim construction rendered other findings erroneous, particularly its finding that FLIR had met its burden of proof to show that prior art combinations would disclose or practice all elements of the claims, as well as the Board's decision to ignore the extraordinary, compelling evidence of objective factors such as long-held need and the failure of others to solve the same technical problem. Third, the Board's findings on the motivation to combine are both legally erroneous and not supported by substantial evidence. The Board misapprehended the evidence regarding principle of operation and intended use and, again, ignored all evidence of secondary considerations. There is no competent evidence to support the Board's findings that the combinations would have been an obvious design choice to a person of ordinary skill or that the POSDA would have expected or predicted the results. Fourth, and finally, these errors require that you reverse the Board's decision and render judgment for LSI. After five IPR petitions and three instituted trials, FLIR has failed to meet its burden of proof and we don't believe that they are entitled to another bite at the apple on any sort of remand. But all of these points that you're making turn on the, are agreeing with your claim construction positions, correct? Absolutely, that is correct. And even either one of them, right? I believe that's true. Okay. In fact, Your Honor, I would put the point this way, that if the Board's claim constructions are affirmed, then the patent claims are anticipated by the Merlin mid-camera. And FLIR has essentially taken that position. Now, they didn't file it as a 102 reference in the PTAB, perhaps because it was in the prosecution history, but the conclusion there would be that after almost nine years of examination, that the Patent Office allowed claims that are fully anticipated by a device that is thoroughly discussed in the patent specification. Well, claim 18 of the 496 wouldn't be anticipated by the Merlin, right? That's right. Because it has a 600 nanometer limit. That's correct. I was speaking with respect to the independent claims, and they pointed out in their brief that at least there would be one claim that limits the bandwidth of the filter specifically at an upper limit. So with respect to that one claim, you're correct. But with respect to the others, we think that, and we would acknowledge that under the Board's claim constructions, the Merlin mid-camera with a 2,000 micron filter practices these claims when we all know that it was completely unsuitable for leak detection, unmodified with a filter that wide, that it could only even image a gas under very, very rare conditions with a high delta-T with an integration time adjustment on the camera where the leak is known so that you can point the device at a fixed stream where you know where it is. Well, it all turns on delta-T, doesn't it, really? I mean, if you have a high enough delta-T, it doesn't really matter what other features the camera has or doesn't have, right? Yes, with respect to the Merlin mid or many of the other prior art systems with a sufficient delta-T, there are systems that have been known all the way back since at least Stratkin in 1985 that have been able to image a gas under some conditions where there's a high delta-T, of course. That's sort of the starting point with the technical problem. In the field, very often, in fact, maybe most times, you don't have a sufficient delta-T. The Stratkin system, for example, didn't work when the ambient temperatures fell below about 85 degrees. So if you're an oil man in Baytown, Texas, and you want to know where the leaks are, but the ambient temperature is less than 85 degrees, the Merlin mid or any of these other prior art cameras aren't going to do you any good. But Stratkin says, look, if you have improved detection and improved processing, you can do better than 85 degrees. You can go lower. Why isn't that exactly what the Merlin mid did? Plus putting the filter in the cold refrigerated section with the emission sensor. So that is the speculation or prediction, if you will, from Stratkin. However, we don't believe that if you took the actual filter that was in Stratkin, and certainly there's no evidence in the record that would indicate that if you put that in the Merlin mid with a higher detector, that that's actually going to work. And here, I believe, is the reason why. The filter is too wide, and it's going to suffer from what's referred to as the washout problem. It's discussed in the prosecution history. The filter in Stratkin is too wide? The filter in Stratkin, if I recall, was in the range of your patent, right? No. Well, first of all, we need to talk about what's within the range of our patent. The range of your patent is a minimum of 101 claims or 200 and other claims, and a maximum of 601 of the claims, and no maximum stated in the other claims other than by implication of saying, well, it won't work very well if it's too wide, right? Is that a fair statement? With just one little caveat, which is it's not by implication, right? There is an imposed limitation that requires the camera to be able to produce a certain result. The implication is if it can produce that result, it must have a narrower filter than the Merlin. That's your argument. It's my argument, and it's also based on evidence that's in the record that the Merlin would not be able to do that with its own filter. Now, there is no evidence in the record, and it's not our burden. It's our primary point on this appeal is that they have not met their burden to put evidence in the record that if you take a 500 nanometer filter, which is important. We need to discuss this. It's not 200 nanometers. It's a 500 nanometer filter passband. That term is used in the patents. If you put that into the Merlin mid-camera, there is no evidence in the record one way or the other that anyone in this courtroom can begin to know whether it's going to work, and I think there's really good evidence. Did you really raise an argument with the board about having an upper limit on the width? Absolutely, both in our briefs and at the hearing. This was discussed extensively, that it was unable to – that the ability to detect absorption within the narrow bands of interest would be overwhelmed by infrared radiation that was coming in from these adjacent bands. And so that's really the – finding the sweet spot, the right width of the filter, is a combination of wanting to detect multiple gases of interest, so it can't be the sort of micro filters like the 40 nanometer filters in Wimmers that are calibrated to one particular gas of interest. That's why you get at least about 100 or at least about 200 in Wimmers. But Wimmers is – they're very narrow filters. They're in the range of 100, and one of them is 90, I think, right? In Wimmers. The filters that are tested in Wimmers, I would have to check. Yeah, one of them is 40, one of the others not. He notes that it had been demonstrated that as small as 40 was good, and that the narrower is better. That's the teaching from Wimmers. And so we get – in our pattern, we get at least about 100 or at least about 200 specifically so that the camera will be able to detect multiple gases of interest. Okay, so that's the lower limit. The upper limit, then, is at some point the filter is going to get too wide and it's going to suffer from the washout problem. But isn't this – in terms of going after multiple gases or multiple absorption lines for a single gas, some of which often fall within a fairly narrow range, isn't that just very pedestrian kind of determination from the catalog, well-known catalog of emission absorption lines, to look at the – at where the lines fall and then design your filter according to which gases you want to pick up? So – Why is that anything new? I don't disagree with the idea that detecting multiple gases of interest using a single filter was done. I mean, that's Strachan. Strachan talks about that and is trying to do it, right? The problem with Strachan is that he sets his filter at 500 – there's actually two filters in Strachan. There's a 500 and a 1,000. And he reports the results of the 1,000. The view in Strachan is as long as it covers – Well, that's aggregate, not half-maximum, right? Yes. That's what – yes, that's exactly right. Passband or aggregate passband. And your 600 limit is half-maximum? For that particular claim, that is correct. And I believe – I want to check this, but I believe that that particular claim is not operating in the midway region but is at the larger window. But I want to caveat on that. I don't think that's terribly important. The point is that you can have certain applications where – like if you're looking for something other than hydrocarbons, for example, where you might use a larger window. Or the fact that there are – that impose a numerical upper limit, right, specifically by talking about the half-width at full maximum, doesn't preclude the fact that the independent claims themselves impose this results limitation that by nature of the physics will have the practical effect of imposing upper limit on how big the filter can be. That's just the physics. And the claim notation that requires you to be able to produce a visible image of the gas under variable conditions will, in practice, impose an upper limit on the size of the filter. But since your claims don't have, except for the claim 18, don't have a maximum, what you're really saying, it seems to me, is that you pick a filter that is above 100 or above 200, but the maximum is determined by whether it works or not. That is exactly correct. So if it works, then you are claiming it. So, for example, if we were trying to prove infringement for a camera, we would test it and see whether it is capable of producing a visible image. And if that camera had a, let's say, a 1,000 nanometer filter, but it still imaged gas as you'd say it infringes, right? I mean, it has to meet the other limitations of the claim, obviously. But the other limitations, it images the gas and it has the cold filter and so forth. A single filter configuration, for example, like if you use the camera of Sato, for example, the tunable filters, that's not going to be good enough. Okay, but a single filter cold in the machine. If I have a really good imaging camera, an improvement on the Merlin, and I can use a 1,000 nanometer filter, wide filter, and I get an image of gas, then you say it infringes, right? Yes, but I think the physics isn't right in your hypothetical. If you have a 1,000 nanometer filter, it's going to wash out and not work. Is your argument that somehow this is in the claims even though it's unstated because it is part of the producing a visible image concept? Yes, Your Honor. But if that's the case, why isn't that a claim construction argument? And I understand that you say you discussed width, and there are plenty of dependent claims that have lots of upper and lower limits. But did you discuss it in the context of claim construction relating to the producing a visible image term? So, no, it was not discussed in terms of claim construction by either side. We, from our preliminary response and then our full patent owner response, have made the argument that they have failed to meet their burden of proof as to this element. We think that produce a visible image has a very plain and ordinary meaning. There's nothing to be construed there. I think everyone in this room knows what that means. And so the question is, if you take a particular device or a particular proposed combination of prior art references, would it do that? And you don't know until you test it. FLIR knows how to do this, by the way, because after they learned of David Furry's Hawk camera and did their business development deal and made the gas find IR, they did testing to see if it would be able to produce a visible image under a variable range of ambient conditions. They very easily could have taken the filter of Strachan or the filter of Culp and plopped it in their Merlin mid and done a field test in their very sophisticated laboratory. I'm sure they could have done it in less than a day. They chose not to do that, and that's why the evidence isn't in the record. You want to get back to claim construction. I didn't mean to get away from that. But to answer your Honor's question, we didn't address this as a claim construction issue because we think it's plain and ordinary. But we have all along, from our first paper and in every paper and particularly in the oral argument, have challenged them by saying you did not meet your burden of proof on this element. And the judges at the PTAB, and when I made this argument, never asked FLIR, why didn't you do some testing? Why didn't you submit some evidence to show whether your proposed combination would produce a visible image under variable ambient conditions or not? That's a big hole in the record. You're way into your rebuttal time. You're down to one minute left. I'll give you two minutes for rebuttal. Thank you, Your Honor. Okay. Good morning, Your Honors. I won't get to the filter width issue. It seems to be of a fair amount of interest. But big picture-wise, the board did its job here. It thoroughly analyzed the prior art. It explained the reasons why this patent is obvious. And at a very high level, Strachan in 1985 basically instructed once again, you can take it off the shelf, pass it by our camera. He disclosed the bandwidth that hydrocarbon gases absorb and emit radiation, three to five microns. He said, hey, use a filter that will focus on that bandwidth and filter out all the extraneous wavelengths that we don't care about. That's what Strachan said in 1985. And he said, you know what? If I have a camera with better detection, I'll get a better result. Cameras caught up with Strachan. And all that Mr. Fury did here is what Strachan told him to do. He took an off-the-shelf Merlin mid-camera that had a cold filter, which was art-recognized as the type of filter you want for this type of application because a warm filter will emit radiation. And he put a hydrocarbon-specific filter in the Merlin mid just as Strachan taught 20 years earlier. And to no one's surprise, at least those familiar with the prior art, the Merlin mid, modified in that way, was very good at emitting gas because it had a fantastic detector called an Innsby detector. And so that detector allows you to pick up smaller delta Ts than Strachan referenced. And the board went through all the evidence, relied on the prior art teachings, the express teachings of the prior art, and discussed the testimony of the witnesses and relied on cross-examination testimony of LSI's witnesses. What's your response to your friend's argument that if you're right, that 90% of this patent should have been anticipated by Merlin, even without reference to Strachan. So does that mean that the examiner got it that wrong, even though Merlin was fully discussed during the course of the prosecution? There were a lot of claims at issue, and a lot of the dependent claims had narrow wave bands and filter widths that the Merlin mid would not have anticipated. And so did the examiner necessarily get it wrong? I don't know. I mean, the examiner was focused on a lot of claims. A lot of claims had narrow bandwidths, and the focus was on some other prior art. Merlin mid was never really a major focus. The focus was on Wimmers, some other prior art where they imaged gas under variable ambient conditions, but they would change the filter every now and then. And so the way they sold this in the patent office is, hey, use a fixed filter configuration rather than changing filters, and you can image gases more than one gas because they have overlapping absorption bands. So I don't want to criticize the examiner, but he probably could have one or two, some of the broader claims. But Mr. Puckett is right, is he not, that with respect to, let's say, a 2,000 nanometer range, that unless you have a whopping large delta T, you're going to get no image, even in the rather discerning, I call it INSB, but what did you call it? INSB. INSB filter, I mean, INSB detector. That's a fair statement, isn't it? Well, actually... I mean, if you took the Merlin and pointed it at a leak without changing your filter at all, you're not going to get anything unless the leak is coming out really cold or really hot, right? I don't think that's necessarily true, Your Honor. You're going to need more delta T than you would with a narrower filter. That's my point. Not a ton of delta T. Well, okay. Who knows how much a ton of delta T is? Right. But you need to increase the delta T above what would be optimal for leak detection purposes, I would think. Absolutely. And it's really an academic exercise at this point because our case is obvious. We're not saying that you would use the Merlin Min on minified. Our case is that you would listen to Strachan, and you'd put a narrower filter in there to image gas. And you would have a reasonable expectation, given the advancements in camera technology, that you're going to image gas at lower delta T's than you did previously. That was your reasonable expectation. And the evidence in the record is from the witnesses from both sides is that, of course, you would expect that the Merlin Min is going to work better than the Strachan camera. It's 20 years more advanced. So, Your Honor, would somebody skilled in there want to use the Merlin Min on minified? Probably not. They would want to do what Strachan told them to do. Yeah. Now, I'm sorry, Your Honor. Clearly, you have to have a visible image. So why wouldn't the common and ordinary meaning of producing a visible image include the concept that you have to have an upper limit on width? Because otherwise, you're not going to have a visible image. I think, common sense speaking, there probably is some practical upper limit somewhere, but it's well above the Strachan filters. We know that the Merlin camera could image jet exhaust. That's 2,000 nanometers wide. So he's not at the practical limit. Really, really hot. It was really, really hot. But let me point to the claims. The claims provide some insight on what this practical limit is. And we know it's above 600 nanometers at half width or maximum. And this is why we know this. I'm looking at the 813 patent claim 1. I'm sorry. What is above 600, did you say? The practical limit necessarily has to be above 600 nanometers at full width, half maximum. Okay. All right. Okay, that's the number that they relied on when they were talking about the maximum filter width. They were talking about the full width at half maximum. Right, but the minimums they're talking about, aggregate bandwidth, whatever that means. Is at the bottom of the curve. Which is indiscernible. I mean, you can't, who knows what it is. Right. So let me just point to claim 1 and claim 37 of the 813 patent. And this will provide some clarity. Claim 1 says that your bandwidth has to be at least about 100 nanometers. There is no expressed upper limit. Even if you accept LSI's argument that there's a practical upper limit, it's going to be well above the Strachan filter size. Because if you go to dependent claim 37, which depends from claim 1, that's where there's an express upper limit. It says that claim 37, I'm at A150 of the appendix. The system of claim 1, wherein the pass band for the filter configuration has a full width at half maximum, transmittance that is less than about 600 nanometers. Okay. The Strachan filters, both of them, are less than 600 nanometers at full width half maximum. Both of the Strachan filters meet dependent claim 37. And claim 37 narrows claim 1. So they have to be within the scope of claim 1, despite whatever upper maximum limit may implicitly exist in claim 1. If you look at the record, at A28, 38, and 39, that's our expert, he testified that the 10% filter in Strachan has a 500 nanometer full width at half maximum, and that the 5% filter has 200 nanometers at full width half maximum. So both of those filters are within the upper limit expressly recited in claim 37. So whatever this magic number is, it's above 600 nanometers, so it's bigger than the Strachan filters. It's wider than the Strachan filters. And they never below. Their argument below was they provided a bunch of reasons why you wouldn't combine this art. Nowhere below did they say once you put the Strachan filter in the Merlin lid that it wouldn't work. That's new. That's new on appeal. That argument was not made below. So unless your honors have any other questions. I have a question. The secondary considerations are objective considerations. The hawk was, seems to me from the evidence, pretty successful, both in terms of its reception in the leak detection community, if there is one, and also in terms of just the fact that it succeeded where prior efforts, at least it did better than some of the prior efforts, some of the active detectors. Why isn't the secondary considerations evidence significant here? A couple reasons, your honor. The first reason is to the extent anybody was surprised by the performance of the hawk, that's a testament to the prior Merlin lid. Let's not forget what happened here. It was the prior Merlin lid camera that Fury put a filter into, a custom filter as taught by Strachan. So to the extent people thought this thing worked great, it had to do with the electronics of the camera, the sensor, the image processing. This is a very complex piece of machinery. But that wasn't the board's basis for discounting the secondary considerations, was it? No. That's your argument, which may or may not be right, but that's not what the board said. The board's basis was twofold. At 846, the board said that given the strong prima facie case of obviousness, all this other evidence of secondary considerations is not sufficient to overcome it. And the board was absolutely right about that because at the end of the day, all that Mr. Fury did was take a state-of-the-art camera, Merlin lid, prior camera, and put a custom hydrocarbon filter in there as Strachan taught. We can't run from that. And so the board said prima facie case is so powerful here that all this other stuff. Even though we've said repeatedly that's not the proper way to do the analysis. Well, I think they did it simultaneously. I didn't think they came to the decision saying it's obvious and say, oh, the secondary considerations didn't talk me out of it. I think they looked at it holistically. And I don't remember the exact wording, but what the board said is this is so obvious. It's so clearly taught by Strachan that these secondary considerations don't persuade us. The other thing the board said is they didn't find the secondary considerations commensurate in scope with the claims. Merlin Hawk, the Hawk is not even within the scope of the 496 patent. The 496 patent requires at least 200 nanometers. Is it 100 nanometer, the Hawk? It's 140 at the base and 64 at half width. So it's outside. But that's within what is the claim one, is it? Right. It's within the scope of the 813 patent. Of the 813, yeah. Right. And the claims don't recite any particular performance criteria. All the claims require is that you can go out and you can image gas under variable ambient conditions. It doesn't require you to detect any particular leak size. It doesn't require you to detect under any specific delta Ts. The prior art imaged under variable ambient conditions. Culp did that. Strachan did that. All the systems tested at the Environ test did that. Everybody tested at the detection limit they were looking for. So the Hawk, the declaration evidence is a little from the petroleum industry, doesn't really match with the Environ report. The Environ report basically says everybody detected leak at the method 21 limit. But it does look like the Hawk did best. Is that a fair statement looking at the chart that was presented to us? I think that's probably a fair statement that it performed best. But it was not like it didn't blow all the others away. In fact, when the FDA implemented the alternative work practice to method 21, they didn't limit it to the Hawk. The EPA. I'm sorry, the EPA. I'm sorry. They didn't limit it to the Hawk. All the cameras tested met the alternative work practice. So I think that's a fair statement. Maybe the Hawk did a little better. But it didn't blow the socks off the other systems. They all imaged gas. Let's go back to the question of the objective indicial, secondary considerations. And you argue that the obviousness was so strong, such a strong prima facie case showing of obviousness, that the secondary considerations weren't able to overcome that. But it seems to me that the more you rely on the strength of obviousness, the question that pops up and pops up in my mind all the time is, if that's the case, if it's so strong, then why hadn't this concept been thought of before? Well, it's an excellent question, Your Honor. And that's just kind of a practical way of looking at it. And the answer, I think, is pretty straightforward, is the concept was thought of before. It was thought of by Strathcote. And basically the camera art caught up. The IR cameras technology caught up to Strathcote. I don't even understand your copying argument, because your copying argument says, well, if all we did was basically take pieces and parts of the prior art, then we're not really copying this combination product. But in that case, any time you have an obviousness case, then you'd wipe out copying. I mean, in other words, it's a circular argument. The whole point is, if you had to copy that, then it's more likely that you couldn't actually pick it out of the prior art, or at least not so easily. I'll try to address that to the best I can understand Your Honor's question. And if I don't get it, I'm sure you'll follow up with me. The copying argument, I mean, we can't forget the camera is the FLIR camera. He took the FLIR camera and put a hydrocarbon-specific filter in there as taught by Strathcote. The only thing you could argue we copied, we didn't copy our own camera, it was our camera. To the extent we copied the concept of putting a hydrocarbon-specific filter in there, that concept was disclosed by Strathcote 20 years earlier. Then why hadn't you done it with the Murrow? Well, we weren't in that business. These cameras are used for military reasons, all sorts of things. Mr. Fury brought a business opportunity to FLIR. He was somebody out there who was using the old method of detecting gas. He was the one out there who was familiar with the people in the industry who had the business contacts, and he came to us and said, hey, your camera. I put this filter on here, and I can use my relationships, and we can see if we can't do business with this industry. So it was a new business opportunity for FLIR. We just weren't focused on that. The Merlin, if I understand it, came out in 2002? The brochure is copied by 2002. It came out right around that time. Then the Hawk was June of 2003? Correct, Your Honor. It was pretty quickly after the Merlin came out that the Hawk was put together. Yes, Your Honor. Culp, in 1994, he put a cold filter in a passive IR camera and compared it to an active system, and he basically was able to image gas at relatively low delta T. So people have been doing it. The Merlin MIT had a better sensor than Culp had, and then Stratton had. The technology has just caught up. We started the argument, I believe, with the acknowledgement that the case turns on the construction. I'm interested in the construction of the term leak. How does the construction of the term leak that excludes unintended emissions, how does that affect the rest of the case? I don't really think it affects this at all. It doesn't matter whether you construe leak to be unintended or intended emission, and even LSI conceded that below with the oral argument. It's not case dispositive. The reason it's not case dispositive is because Stratton discloses detecting leaks. Culp discloses detecting fugitive emissions. When I read the pen and I read that the device can detect, let's say, blowouts or flare-outs, isn't a flare-out an intended leak? Yes, Your Honor. We think the board got the construction right. I was trying to address a question, if you disagree, does it change anything, and it doesn't. Yes, the construction is exactly right. Yes, and I think the patent, again, provides insight into why that's right. If you look at the 496 patent and you go to Claim 1 and Claim 11, Claim 1 basically talks about detecting a leak in a component. Claim 11, I'm on A100, talks about the type of components that you can use, the invention of Claim 1 for detecting leaks in, and he expressly says in Column 30, Line 4, you can look at whether or not you've got a blow-off valve leaking. To your point, what is the purpose of a blow-off valve? To intentionally blow off gas, to blow off leaks. However you want to use the term leak outside the intrinsic record, in the context of this intrinsic record, and if you don't divorce the term leak from this intrinsic record, the record shows you that leak is used broadly to cover both intended and unintended emissions, to image both components that have fugitive emissions and non-fugitive emissions, such as a blow-off valve. Okay, you're over your time. I'm sorry, Your Honor. That's okay, we kept you going. So we'll give you four minutes for rebuttal to make up for the differentiation. Thank you, Your Honors. If I can start by addressing the Claim 37 argument in the upper boundary. Mr. Gabryk is trying to make a claim differentiation argument, if you will. It doesn't work here, and the reason why is because if you look at the various figures in the patent, it discloses that there are other gases with overlapping absorption bands that have widths wider than hydrocarbons, for example, and so there would be embodiments where, for example, something wider than a very narrow 1 or 200 filter would not wash out until you get to some larger upper limit, right? What would be that upper limit, given the intrinsic evidence, the figures and so forth? Well, so it depends on what you're trying to image, and I think the answer is we really, without doing testing, we don't know. We don't know precisely what the upper limit is. Give me a rough estimate of what you think, roughly, what would be the maximum that the patent covers. So with a very highly sensitive detector like the MERLAMID, when you get not very far outside the overlapping absorption range, then you're going to get washout. And so, you know, when you're trying to image hydrocarbons, once that you get to, we're talking about the bottom of the curve now, so the aggregate pass band, and if we're looking at 300, 350, 400, like not far beyond the overlapping range, it's not going to work anymore because that MERLAMID is going to, the detector, it is very sensitive and it's going to see all those adjacent bands and it's going to come in and wash out the image. Remember, when they were... If you're interested in the gases that emit and absorb at those adjacent bands and you're not particularly interested in speciation, then that's a good thing, not a bad thing, right? If you're picking up those additional bands. No, because now if you're outside the overlapping area, right, now you're getting a radiation that's coming in that's going to wash out what would otherwise produce the image. But if the radiation that's coming in is coming in from gases, the emission or absorption lines of gases that you're interested in, then that just enhances your image, right? No, because what's coming in is from the background. Well, I'm supposing that you have, and these emission and absorption lines are all over the place because every gas has multiple lines. So you can well have a range that has multiple lines, right, that you're interested in. Now, what the maximum of that is a practical matter, I suppose, depends on what gases you're interested in. But I would imagine that that range could be pretty large. Perhaps, right? And I think the distinction needs to be drawn between the apparatus and the method claims because the method claims you can't tell until you use them in practice. I'm sorry, Your Honor. But that's the problem. So your claim construction basically says there's an upper limit that's implied, and the implied upper limit depends on whatever your purpose happens to be. So how does one know what the claim really means if it depends on an individual user's purpose? Right. So with respect to the method claims, since you're not going to infringe those until you start undertaking the steps of the method, then you'll know what you're trying to infringe for those. With respect to the apparatus claims, we think that you have to do some testing. And so that's what we would do if we were proving infringement in district court, and it's what they failed to do in trying to make out their validity case. I'm down to my last 45 seconds or so, and so I guess I'll close with this. There's a reason why Graham says that you look at all of the factors together, including the secondary considerations. In hindsight, this patent does appear to be a simple substitution. But in practice, it was not. And the fact that the entire oil and gas industry couldn't figure this out, the fact that the person who developed the Merlin mid-camera, Bill Parrish, provided testimony that he never thought of it or no one at Indigo thought of it, and importantly, and I hope you'll look at Austin Richards and his publications, before David Furry, he does publications that list every application for the Merlin mid that he can think of, and leak detection is not on there. But as soon as David Furry brings this idea to FLIR, it's there. And please look at the Jeff Frank email. FLIR's response, they did not see the commercial opportunity before David, but as soon as he brought this to them, they saw the opportunity, and they wanted to copy it and take it to practice. Those secondary considerations show that this was not obvious at the time to even people of extraordinary skill in the art. David Furry is an inventor and deserves patent protection. Thank you. Thank you.